[Cite as *State v. Allen*, 2012-Ohio-3273.]

## IN THE COURT OF APPEALS OF MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 24616 |
| vs. | : | T.C. CASE NOS. 11CRB951,1235 |
| SEAN E. ALLEN, SR. | : | (Criminal Appeal from Municipal Court) |
| Defendant-Appellant | : | |

· · · · · · · · ·

## O P I N I O N

Rendered on the 20th day of July, 2012.

· · · · · · · · ·

John Danish, City Attorney; Stephanie Cook, Chief Prosecutor; Matthew Kortjohn, Atty. Reg. No. 0083743, Asst. Prosecutor, 335 W. Third Street, Dayton, OH 45402
        Attorneys for Plaintiff-Appellee

Helen Wallace, Atty. Reg. No. 0071989, 854 East Franklin Street, Centerville, OH 45459

        Attorney for Defendant-Appellant

· · · · · · · · ·

GRADY, P.J.:

{¶ 1}  Defendant Sean Allen appeals from his conviction for domestic violence, R.C. 2919.25(C); aggravated menacing, R.C. 2903.21(A); and violation of a protection order, R.C. 2919.27(A)(1), all first-degree misdemeanors.

{¶ 2}  For most of the past 17 years, Defendant has lived with Cynthia Farrar.  The

couple has had four children together, but have a volatile relationship. Farrar has filed at least eight domestic violence complaints against Defendant, three of which resulted in convictions.

{¶ 3} In early 2011, Defendant was serving a 90-day sentence for domestic violence against Farrar. Farrar visited him several times, and during two of the visits she told Defendant that their relationship could not continue. Farrar told Defendant that she would not drive him home from jail as she had done in the past. When Defendant was released from jail, he went to stay at his parents' home. On the same day, Farrar left town for the weekend.

{¶ 4} Soon after Farrar's return, on Sunday evening, Defendant appeared at her home, banging on the door and window, and screaming at her to talk to him. Farrar called the police, but by the time police arrived Defendant had left. After police left, however, Defendant returned. Farrar again called the police. The police responded and took Defendant to a relative's home. Defendant repeatedly called his children's phones, asking them to put him on speaker so that he could talk to Farrar.

{¶ 5} Early the following morning, Defendant arrived at a restaurant across the street from the child care center where Farrar works. He talked to one of Farrar's co-workers, Christine Smith, and told Smith that he wanted her to take him to talk to Farrar. Smith told Defendant that she needed to call Farrar, but he told her not to. Smith nevertheless went into the restaurant and called Farrar, who was pulling into the parking lot of the child care center with her three younger children.

{¶ 6} Farrar needed to be at the center to open for the day, but she was afraid to get

out of her truck with Defendant there. Farrar left the parking lot and called the police. Smith called Farrar to let her know that Defendant had left. Farrar dropped her children off at another child care center and returned to the one where she worked, knowing that the police were en route. As Farrar started to open her door, Defendant appeared from behind Smith's car. Farrar locked her door. Defendant repeatedly banged on the window and yelled at her that he wanted to talk.

{¶ 7} As Farrar looked around, hoping to see the police nearby, Defendant grew increasingly angry. Defendant pulled his sleeve around his hand and continued pounding hard on the window. Farrar believed that Defendant was going to break it. Farrar recognized the look of Defendant's anger growing into violence, and she feared that if Defendant succeeded in breaking the window, he would hurt her.

{¶ 8} As Farrar backed out, Defendant jumped onto the running board of her truck. She pulled onto the road with Defendant hanging onto the side of her truck, still swinging at the window. Suddenly, Defendant fell from the truck. Farrar stopped two streets away and called the police again. The police arrived and found Farrar crying and hysterical. Defendant was taken to the hospital and then to jail.

{¶ 9} The following day, Farrar obtained a temporary protection order. Within a couple of hours, Defendant started calling Farrar from jail. Jail records indicate that 32 calls were placed from the jail to Farrar's cell phone. Farrar recognized Defendant's voice in the 15 to 20 messages that he left for her during the course of that day and the next.

{¶ 10} Defendant was indicted on one count of domestic violence and one count of aggravated menacing. Ten days later, Defendant was charged with one count of violation of

a protection order. The three charges were tried to the bench.

{¶ 11} Defendant testified that it was not clear to him that Farrar wanted nothing more to do with him and insisted that he just wanted to talk to Farrar about their relationship. He admitted to knocking on Farrar's door and window, but denied banging on them or yelling at her. Defendant claimed that after the police arrived and took him to his uncle's, he spent more than an hour on the telephone with Farrar.

{¶ 12} As for the incident on the following day, Defendant admitted that he jumped on the running board of Farrar's vehicle when Farrar started to back up, and that when she started to drive away, he hit the window and told her to stop. But, he insisted, he never covered his hand with his sleeve or intended to break the window.

{¶ 13} The trial court found Defendant guilty of all charges and sentenced him accordingly. Defendant appeals, raising the following assignment of error:

"APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 14} A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Hufnagle,* 2d Dist. Montgomery No. 15563, 1996 WL 501470 (Sept. 6, 1996). The proper test to apply to that inquiry is the one set forth in *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983): "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial

ordered." Accord, *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶ 15} Defendant was convicted of violation of a protection order in violation of R.C. 2919.27(A)(1), which states that no person shall recklessly violate the terms of any protection order issued against him. Defendant does not deny that placing telephone calls to Farrar is a violation of the temporary protection order that she obtained. Instead, he argues that the State failed to prove that he is the person who made the calls to Farrar.

{¶ 16} Jail records indicate that 32 calls were placed from the jail to Farrar's cell phone. Although at least eight other inmates had access to the same phone, Farrar testified that Defendant was the only person she knew in the jail at that time. Moreover, Farrar recognized Defendant's voice in the 15 to 20 messages he left for her during the course of that day and the next. The State introduced a recording of one of those messages into evidence. Defendant's conviction for violation of a protection order is not against the manifest weight of the evidence.

{¶ 17} Defendant was also convicted of domestic violence and aggravated menacing. Domestic violence is proscribed by R.C. 2919.25(C), which states "No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." Aggravated menacing is proscribed by R.C. 2903.21(A), which states: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person * * * ."

{¶ 18} Defendant maintains that the State's evidence does not support a finding that he knowingly caused Farrar to believe that he would cause imminent or serious physical harm

to her or another. He insists that he never uttered a threat against Farrar, Smith was not afraid of him, and Farrar was not afraid of him since she visited him in jail on many occasions and even brought their children for visits. For the following reasons, we conclude that Defendant's convictions for aggravated menacing and domestic violence are not against the manifest weight of the evidence.

{¶ 19} Contrary to Defendant's assertion, a threat to cause physical harm need not be verbalized; it may be implied by the offender's actions. *State v. El-Hardan,* 2d Dist. Montgomery No. 24293, 2011-Ohio-4453, ¶ 46*,* citing *State v. Terzo,* 12th Dist. Butler No. CA2002-08-194, 2003-Ohio-5983, ¶ 18. Furthermore, Defendant's previous acts of domestic violence against Farrar are relevant to the determination of whether she had a reasonable fear of physical harm of him on the day of the incident at her workplace. *State v. Collie,* 108 Ohio App.3d 580, 584, 671 N.E.2d 338 (1st Dist.1996).

{¶ 20} Smith's earlier lack of fear of Defendant is irrelevant to the issue of Farrar's fear when these offenses were committed. Similarly, Farrar's lack of fear while Defendant was incarcerated is irrelevant to the question of whether she feared him when he screamed at her and pounded on the window of her truck. Farrar explained that she was not afraid of Defendant during the visits in jail because they were separated by thick glass and bars.

{¶ 21} On the other hand, Farrar testified that she feared that any conversation with Defendant after his release from jail would result in "violence [or] abuse" against her. She was afraid that he would smash the window of her truck and hurt her. Farrar was familiar with Defendant's temper, and she recognized the look on his face as his anger grew that morning as the look that had preceded Defendant's violent outbursts against her in the past.

{¶ 22} Additionally, Farrar's actions of repeatedly calling the police and dropping her children off at another child care center, as well as her hysterical crying upon the arrival of the police, support her testimony that she feared imminent physical harm at the hands of Defendant.

{¶ 23} The essence of all of Defendant's claims is that he believes that his testimony was more credible than the testimony of the State's witnesses. However, the credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). In *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997), we observed:

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the fact finder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact finder, who has seen and heard the witness.

{¶ 24} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). We do not find the testimony of the State's witnesses to be inherently incredible.

{¶ 25} Defendant's sole assignment of error is overruled.  The judgment of the trial court will be affirmed.

DONOVAN, J., And HALL, J., concur.

Copies mailed to:

Matthew Kortjohn, Esq.
Helen Wallace, Esq.
Hon. Carl Sims Henderson